UNITED STATES *v.* WILKINSON PROCESS RUBBER SALES CORP. (No. 3715)[1]

WILKINSON PROCESS RUBBER SALES CORP. *v.* UNITED STATES (No. 3718)[1]

[1] T. D. 47051.

United States Court of Customs and Patent Appeals, April 30, 1934

*Charles D. Lawrence*, Assistant Attorney General (*William H. Futrell*, special attorney, of counsel), for the United States.
*Curtis E. Loehle* for Wilkinson Process Rubber Sales Corp.

[Oral argument February 12, 1934, by Mr. Lawrence; submitted on record by appellee]

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges[2]

BLAND, Judge, delivered the opinion of the court:

The appeal and cross appeal here under consideration involve the proper classification of an importation known as "linatex" which the appraiser describes as follows:

The merchandise covered by this protest is known as "linatex" rubber lining belts. It is a rubber manufactured by a new process, sold in rolls usually 50 ft. long by 4 ft. wide, and is of various gauges, from $\frac{1}{24}$ of an inch to $\frac{3}{4}$ of an inch. Sometimes it is reinforced with cotton and sometimes it is not, but rubber is always the material of chief value.

It was therefore properly returned for duty as a manufacture of India rubber, at 25 per centum ad valorem under paragraph 1537, law of 1930.

The merchandise involved is represented by Exhibits 1, 2, and 3, which consist of rubber in rolls, usually 50 feet long and 4 feet wide, having a thickness of from one twenty-fourth inch to three-fourths inch. Certain other sheets of imported rubber, reinforced with cotton, were originally involved, but in the trial below the importer abandoned its protest as to them.

The collector classified the merchandise as a manufacture of india rubber and assessed duty at 25 per centum ad valorem under paragraph 1537 (b) of the Tariff Act of 1930. The importer in its protest claimed the merchandise to be free of duty under paragraph 1697 as india rubber, crude. The claim was also made, alternatively, that it was dutiable under paragraph 1558, as a nonenumerated article, manufactured in whole or in part, at 20 per centum ad valorem.

The United States Customs Court, First Division, in an opinion by Judge McClelland, sustained the protest of the importer to the extent that the merchandise was held to be dutiable at 20 per centum ad valorem under said paragraph 1558.

---

[2] Hatfield, J., did not participate in this case.

The Government has here appealed from the judgment of the trial court, and contends that the court should have held the merchandise dutiable under paragraph 1537 as a manufacture of india rubber.

The importer has cross appealed from the judgment of the court below, and contends that it should have held the merchandise classifiable free of duty as india rubber, crude, under paragraph 1697.

The material portions of the said competing paragraphs are as follows:

PAR. 1537 * * * (b) Manufactures of india rubber or gutta-percha, or of which these substances or either of them is the component material of chief value, not specially provided for, 25 per centum ad valorem; * * *

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1697. India rubber and gutta-percha, crude, including jelutong or pontianak, guayule, gutta balata, and gutta siak, and scrap or refuse india rubber and gutta-percha fit only for remanufacture.

The record contains the testimony of Henry F. Ball, foreman of the Wilkinson Process Rubber Sales Corporation, which, in this country, manufactures various articles from the imported merchandise; also the testimony of F. K. Ballard, examiner-chemist at the port of Chicago, and also the testimony of Bernard Wilkinson, who is managing director of the Wilkinson Process Rubber Company, Ltd., which firm is located in the Federated Malay States. The testimony of Bernard Wilkinson was taken under commission and is in the form of answers to interrogatories and cross-interrogatories.

The record shows that the said Bernard Wilkinson was the inventor of the process of making the imported material and that the imported material is not sold by the importer or by any of its associated selling agencies in the condition imported, but that it is sold after having been manufactured into finished articles. The imported material, after importation, is cemented or fastened together and cut and built into various articles, which articles are used for many different purposes. Collective Illustrative Exhibit B consists of three of such articles, one being a wedge-shaped article of pliable resilient rubber made of four layers of rubber, such as Exhibit 3 which is one half inch in thickness. This wedge and similar articles are placed between metal parts and elsewhere to prevent friction and noise. Another of the articles in Collective Illustrative Exhibit B, called a gasket liner, has been built up by the use of different layers of the imported material and is used for substantially the same purposes as the wedge. Some of the articles manufactured from the imported material are used for lining chutes or boxes where it is necessary to resist wear and sudden stresses and shocks. The third article in Illustrative Exhibit B is cap-shaped and about 6 inches

wide and 2 inches high, is called à mushroom valve, and is made from imported sheets which are one half inch thick.

Said Ball testified that the imported material could not be molded but that it was not vulcanized. The Government's witness, Ballard, testified that he analyzed portions of the imported merchandise and attempted to dissolve them in benzine which is a solvent of crude rubber; that the sample "swelled up" but did not dissolve; that this indicated that the rubber was not crude but was vulcanized. He also stated that the two samples contained sulphur and that the quantity of sulphur was an appreciable quantity and was not negligible; that he did not know the quantity of sulphur the merchandise contained; that it contained zinc oxide and iron oxide. The record elsewhere indicates that some oxide was used for the purpose of color. The witness also stated that he made the same test on crude rubber and that when placed in benzine the crude rubber dissolved and completely disappeared. Samples of the crude rubber from which were taken the pieces upon which the latter tests were made were introduced in evidence.

The answers to the interrogatories by Bernard Wilkinson show that in order to make the imported material, fresh rubber latex is essential. This is conveyed to the factory from the trees in a fresh condition and is there coagulated by the addition of "approximately 8 percent of finely divided chemical matter" and after coagulation the coagulum is pressed out into sheets of different thickness; that latex such as is used in making the importation could be exported from the country of its origin in its crudest form by preservation with ammonia but that latex so treated would not serve for the purpose of manufacture under the Wilkinson process; that there is an intermediate stage between plantation crepe, which is a form of crude rubber, and what the witness deemed to be vulcanized rubber; that this is made by laminating a sufficient number of layers of ordinary plantation crepe together so as to form sheets of material suitable for use as shoe soles. It is made clear that rubber so treated is not the same kind of rubber as that at bar.

The merchandise at bar has much the appearance of ordinary vulcanized rubber, is flexible and pliable, and has great strength and much resiliency.

There was also introduced in evidence Exhibit 4, which is a publication by the importer entitled "Linatex", which deals with the characteristics, mode of manufacture, etc., of the imported merchandise. In said publication the mode of manufacture of "Linatex" such as is at bar, as well as facts relating to crude rubber and hard vulcanized rubber is shown. The following is quoted therefrom:

A fleet of motor tank lorries collects the latex from the source of supply and delivers it to the factory where it flows into the special reception and weighing

64

tanks. The latex is then adjusted chemically so that nascent sulphur is released from a sulphur-containing protein present in the latex. A small quantity of chemical matter is added and the coloring pigment which gives "*Linatex*" its characteristic color, but these are not added in powder form. A special department deals with the preparation of the chemicals, which are passed a number of times through special machines which break the chemicals down on a film of water into a very fine state of subdivision so that a colloidal or pseudo-colloidal state results. Only the necessary amount of chemical matter is added to produce the reactions upon which the novelty of the process depends and the finished product contains over 90 percent of pure rubber.

A comparison may be made here between the methods employed in the usual heat vulcanization of rubber and those employed by the Wilkinson process, to mix the chemical matter with the rubber. Heat-vulcanized rubber is macerated, as has been stated, and chemicals are added to the mass. It is obvious that the mixing cannot be so complete in the case of a plastic dough as with a relatively dilute liquid. In the "Wilkinson Process", the superwetted, pseudo-colloidal chemicals after addition to the latex combine perfectly with the rubber molecules and the only energy necessary is mild agitation or stirring. The chemical reactions occur rapidly in the rubber when it is in liquid form. A state of what may be termed incipient vulcanization is produced and no heat is used in the process.

Upon the foregoing record the trial court held, and we think properly, that the imported merchandise was not free of duty as crude india rubber and that it was properly dutiable under paragraph 1558 at 20 per centum as a nonenumerated manufactured article. It seems clear to us from this record that manufacturing steps in the processing of the imported rubber have been taken prior to importation which removes the importation from the crude state. It is well known that processes of vulcanization, usually with the use of sulphur, give to crude rubber certain new and valuable characteristics which the crude rubber does not possess. The merchandise at bar, which has been treated by a new and patented process, we think is shown to have many, if not all, of the characteristics of vulcanized rubber. The treatment of the crude rubber which brought it to its imported condition constituted, we think, a manufacturing effort which took the crude rubber out of its crude state. The Government argues that since the crude rubber has been manufactured, it is, therefore, accurately and specifically described as a manufacture of india rubber under paragraph 1537.

As this and other courts have frequently said, it is not always easy to determine, as a matter of law, when a thing is the manufacture of another thing. The difficulty of such a determination arises largely from the different expressions used by Congress in the various tariff acts. In tariff legislation Congress has frequently distinguished between the "manufacture of" an article and a thing which has been manufactured. Numerous examples, illustrative of this fact, could be given, but it is sufficient to call attention to a few of them. In the lumber schedule of the Tariff Act of 1930 and the lumber schedules

of other tariff acts, provision was made for "manufactures of wood", and in the same schedules certain wood or lumber products are provided for when *manufactured* in a certain way or to a certain extent. In the same act, paragraph 1540 provides for sea grass *"if manufactured or dyed"* (italics ours), while in paragraph 1537 (a) "manufactures of  *  *  *  sea grass" are provided for.

This court on frequent occasions has been called upon to determine what constitutes the "manufacture of" an article. While the decisions may not seem entirely harmonious, in particulars which are of no concern here, this court has definitely adhered to a rule which, we think, is illustrated by the language used in *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T.D. 38963:

>  *  *  *  While this meaning has been enlarged, yet, there still remains the idea that to constitute a manufacture of a thing, or a thing manufactured, it must appear that something has been produced so changed or advanced in condition from what it was before being subjected to the processing or treatment that whether of only one material or of more than one, it has attained a distinctive name, character, or use, different from that originally possessed by the material or materials before being subjected to the manufacturing process.

It is the contention of the Government that the imported merchandise meets the requirements of the above-quoted pronouncement. In some respects, if the literal wording only of the above quotation were considered, there would appear to be some plausibility in the Government's contention. The difficulty with its position, however, is that it seeks to apply the above rule to the imported merchandise which is still a material and is suitable only to be used as a material for being manufactured into articles which themselves would be manufactures of rubber. The Government's contention makes no distinction between an advanced rubber material and a completely manufactured rubber article made from the rubber material.

The decision in *Tide Water Oil Co.* v. *United States*, 171 U.S. 210, is relied upon by the Government as supporting authority. The question before the Supreme Court of the United States there, and the question before us here are not analogous. There the importation consisted of shooks, which were boards sawed and bound together in bundles and were ready to be made up into boxes in this country. The only further operations required to make them into boxes were nailing them together and trimming them. Drawback was claimed upon the theory that the boxes had been wholly manufactured in this country from imported material. The substance of the decision was that they had not been wholly manufactured in any one country and that the terms of the statute were not complied with. In defining the word "manufacture", however, the court used some

language which the Government urges is applicable here. It was there said:

> * * * Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name.

There is no question but what the statements of the court there made as to what constituted a manufacturing effort, as applied to raw materials and as applicable to the statute then being construed, are the settled law of the land. There is no question but what under the rule there stated the imported rubber at bar has been manufactured beyond the crude stage. It is, therefore, a nonenumerated manufactured article. It is not a manufacture of rubber and dutiable within the provisions of paragraph 1537 for the reason that it is still only a material and has not been dedicated to any particular use.

In *Kleinberger & Katz* v. *United States*, 12 Ct. Cust. Appls. 571, T.D. 40798, a case which is not often cited by this court, by reason of the nonconcurrence of a majority upon certain language used (not material here), we think the views of this court which are applicable to the particular question now under consideration are clearly stated. The majority opinion contains the following:

> Viewing the case at bar by the light of these decisions, it must appear the goods in question are not manufactures of leather. That they have been processed and subjected to manufacturing is obvious; but there may be, and often is, a clear distinction between an article which has been manufactured and a manufacture of certain material. The one phrase imports a processing operation; the other imports a completed article of commerce. * * *

It is not our purpose here to review all the pertinent authorities on the subject. They have been reviewed by this court on frequent occasions and repetition here is unnecessary. See *Konishi Kotakudo Co. (Inc.)* v. *United States*, 17 C.C.P.A. (Customs) 355, T.D. 43798; *Ishimitsu* v. *United States, supra; A. H. Ringk & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 132, T.D. 42769; *Fujii Shoten* v. *United States*, 17 C.C.P.A. (Customs) 79, T.D. 43362.

We are of the opinion that the United States Customs Court reached the correct conclusion in holding the merchandise at bar to be dutiable as a *nonenumerated manufactured article* under paragraph 1558, and its judgment is *affirmed*.